# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS PENSION FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS WELFARE FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS SAVINGS FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS APPRENTICESHIP FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS SCHOLARSHIP FUND; and TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS JOINT JOINT COOPERATION TRUST FUND,<br><br>　　　　Plaintiffs,<br><br>　　vs.<br><br>JOHN KNY PAINTING & DECORATING, INC., an Illinois corporation; FINE FINISHES & RESTORATION, INC., an Illinois corporation; and JOHN H. KNY, individually,<br><br>　　　　Defendants. | Case No. 14 C 6507 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

　　The trustees of six multi-employer fringe benefit funds have sued John Kny Painting & Decorating, Inc. (Kny Painting), Fine Finishes & Restoration, Inc. (Fine Finishes), and John H. Kny, alleging that they violated the Employee Retirement Income Security Act of 1974 (ERISA). Specifically, plaintiffs allege that Kny closed Kny Painting and opened Fine Finishes in its stead for the sole purpose of evading Kny Painting's

obligations under a collective bargaining agreement.  Both sides have moved for summary judgment.  For the reasons stated below, the Court denies both parties' motions.

**Background**

The following facts are taken from the parties' materials submitted at summary judgment.  Kny's father founded Kny Painting in the summer of 1979.  Around the same time, Kny began to work for his father's company.  Kny began his time with Kny Painting as a part-time helper, but after graduating from high school in 1980, he began to work full-time as a painter.  From 1981 until it ceased operations in January 2010, Kny Painting was signatory to successive collective bargaining agreements (CBAs) with Painters' District Council #14 ("the Union").  Each iteration of Kny Painting's CBA, from 1981 through 2010, required the company to pay certain wages and make contributions to fringe benefits funds for Kny Painting's employees.

Kny's father was the company's sole owner and sole shareholder, and for at least the first nine years of Kny Painting's existence, Kny was a regular employee of the company who had neither an ownership stake nor decision making authority.  As the years passed, however, Kny began to take on more responsibility in his father's business.  In 1988, it was Kny who signed Kny Painting's CBA.  In or before 1998, Kny assumed the presidency of Kny Painting from his father, at which time the company's business address was changed to Kny's home address.  Kny also stopped working as a painter and began estimating and preparing bids for the company, paying the company's bills, ordering supplies, invoicing, preparing payroll, and supervising the company's workforce.  In 1999, Kny signed Kny Painting's lease for its shop in Buffalo

Grove. In the early 2000s, Kny became the primary contact person for Kny Painting's customers. In 2001, Kny served as the company's chief representative in a dispute with the Union over overtime pay.

Around 2005, Kny's father began to serve Kny Painting in an even more limited capacity and stopped receiving a salary from the company. Meanwhile, Kny's role expanded further—he purchased a new shop space in Wheeling for Kny Painting, began driving a company car, and put some of his own money into the company, either as an investment or as a loan. During this time, some employees observed that Kny's father seemed to have almost no role at all in the company, and at least one person who worked with Kny Painting at the time does not recall even knowing that Kny's father existed. Defendants contend, however, that even after Kny's father took a step back in 2005, he did not completely step away from Kny Painting. It is undisputed that Kny's father remained the sole owner of Kny Painting throughout the entirety of its existence, and according to defendants, Kny remained unable to make any major final decisions for the company without his father's approval.

In 2009, Kny's father finally decided it was time to retire. He told his son that he would retire at the end of the year, and asked Kny if he would like to continue Kny Painting. Kny declined his father's offer to continue Kny Painting, opting instead to open a new company. Kny incorporated Fine Finishes in October 2009 and registered the company at his home address (which, at the time, was also Kny Painting's business address) while also opening a P.O. box for the new company. By November, Kny Painting was no longer making bids on new projects, and upon the conclusion of its last outstanding job, Kny Painting officially ceased operations two weeks into January 2010.

3

Kny Painting notified the Union that it was permanently closing and that final paychecks would be issued in short order. Kny Painting's official business phone numbers were disconnected by February 2010. That month, Kny and his father cleaned out the Wheeling shop space and discarded all of the equipment housed there. Kny Painting's accountants performed a final audit in June 2010.

Before Kny Painting's dissolution was complete, Fine Finishes began hiring employees and bidding on projects. Kny did not require prospective employees to fill out employment applications but rather relied on his father's recommendations to hire employees who had either worked for Kny Painting previously or had been referred by former Kny Painting employees. Kny Painting employees were not told in advance that the company was going to be dissolved, and many experienced no gap in work or pay between their termination from Kny Painting and their commencement with Fine Finishes. Former clients of Kny Painting who were accustomed to calling Kny on his cellular phone to request work from Kny Painting continued to do so when requesting work from Fine Finishes. Kny informed prospective customers seeking Kny Painting that the company no longer existed and that Fine Finishes would be willing to bid on the work instead. He made no effort to proactively solicit work from former Kny Painting clients; in fact, Kny "did not take any action to publicize or announce the creation of [Fine Finishes] and did not instruct anyone to prepare or engage in any such publicity." Defs.' Stat. of Material Facts, dkt. no. 71, ¶ 29.

At one point, a Fine Finishes employee represented to a painter for another decorator that he worked for "Fine Finishes, formerly known as John Kny Painting & Decorating." In many ways, Fine Finishes resembled Kny Painting. In 2010, thirty or

4

more of Fine Finishes' fifty-six customers were either former Kny Painting customers or customers that Fine Finishes signed up prior to Kny Painting's dissolution.  Over the course of the next four years, Fine Finishes established relationships with and performed work for over sixty of Kny Painting's former customers in the greater Chicago area.  Fine Finishes continued to receive faxes on Kny Painting's fax line for two years, though Fine Finishes received only ten or fewer faxes on that line and never sent faxes through it.  Fine Finishes was a subcontractor for the same general contractor used by Kny Painting, and it employed the same lawyers, accountants, and insurance agents as Kny Painting.  It also used some of the same material suppliers as Kny Painting, and maintained business relationships with numerous interior designers with whom Kny Painting had also had relationships.

In other ways, Kny's new company was different from that of Kny Painting.  For one thing, Kny owned Fine Finishes, and his father had no stake.  For another, Fine Finishes performed work outside of the greater Chicago area.  And although Kny Painting had done some wood finishing and restoration work in the past, its primary business activity was commercial and residential painting; refinishing work was not the type of work it normally performed.  Fine Finishes, on the other hand, was principally oriented toward painting, restoration, and fine finishing for high-end residential customers.  The other crucial difference between Fine Finishes and Kny Painting, of course, was that Fine Finishes was a non-union company.  Its employees received lower wages, and most did not receive health care or other fringe benefits from the company.

Plaintiffs sued defendants in August 2014.  The parties engaged in discovery,

5

and both sides have now moved for summary judgment.

**Discussion**

Summary judgment is proper when the moving party "shows that there is no genuine dispute as to any material fact and [that] the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On a motion for summary judgment, the Court draws reasonable inferences in favor of the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006). The Court's "function is not to weigh the evidence but merely to determine if there is a genuine issue for trial." *Bennett v. Roberts*, 295 F.3d 687, 694 (7th Cir. 2002). "Summary judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

On cross-motions for summary judgment, the Court assesses whether each movant has satisfied the requirements of Rule 56. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005). "As with any summary judgment motion, [the Court] review[s] cross-motions for summary judgment construing all facts, and drawing all reasonable inferences from those facts, in favor of the nonmoving party." *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013) (internal quotation marks omitted).

Although not a signatory to a CBA, Fine Finishes may be bound by Kny Painting's CBA if Fine Finishes is found to be Kny Painting's alter ego. The alter ego inquiry "focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement, such as through a sham transfer of assets." *Int'l Union of Operating Eng'rs, Local 150, AFL–CIO*

6

*v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987) (quoting *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir. 1983)). When attempting to discern whether a new company is another's alter ego, courts (or, at trial, finders of fact) engage in a fact-intensive analysis, examining factors like whether the two companies have "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Int'l Union of Operating Eng'rs, Local 150, AFL–CIO v. Rabine*, 161 F.3d 427, 433 (7th Cir. 1998). Although not the keystone to proving alter ego in some other circuits, unlawful motive or intent is the most critical factor for finding alter ego status in the Seventh Circuit. *Compare Trs. of Pension, Welfare and Vacation Fringe Benefit Funds of IBEW Local 701 v. Favia Elec. Co.*, 995 F.2d 785, 789 (7th Cir. 1993) (quoting *Centor Contractors*, 831 F.2d at 1312), *with Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL–CIO v. Dorn Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012) (holding that intent to evade collective bargaining obligations is merely one factor among many that must be considered).

ERISA does not contain specific rules about alter ego liability, so the Court follows Illinois law on the issue. *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1193–94 (7th Cir. 1989). Under Illinois law, a plaintiff seeking to hold a defendant liable under the alter ego theory must establish that (1) there is unity of interest and ownership as described above, and (2) "'adhering to the fiction of a separate corporate existence would promote injustice or inequity.'" *Int'l Fin. Servs. Corp. v. Chromas Techs. Canada, Inc.*, 356 F.3d 731, 736 (7th Cir. 2004) (quoting *Melko v. Dionisio*, 219 Ill. App. 3d 1048, 580 N.E.2d 586, 594 (1991)). Because the second requirement may be met by showing "*either* the sanctioning of a fraud (intentional wrongdoing) *or* the promotion of injustice,"

7

*Koch Refining v. Farmers Union Cent. Exch.*, 831 F.2d 1339, 1345 (7th Cir. 1987), a plaintiff can succeed on an alter ego claim even where he does not show that a defendant perpetrated a sham asset transfer or other fraudulent act.

The parties agree that the ownership structure of Fine Finishes is not substantially identical to the ownership structure of Kny Painting—it is undisputed that Kny's father was the sole owner and shareholder of Kny Painting, and that Kny is the sole owner and shareholder of Fine Finishes. Every other factor, however, is hotly disputed. Plaintiffs contend that Kny's father owned Kny Painting but began to withdraw from the company as early as 1988 and was completely uninvolved for at least the last five years of Kny Painting's existence. Plaintiffs also point to evidence in the record that Kny had essentially all of the decision-making responsibilities and was the face of Kny Painting both inside and outside the company, and that Kny put money into the company. For their part, defendants rely on Kny's and his father's sworn statements that Kny could not make major decisions for Kny Painting without his father's approval and that the money Kny put into Kny Painting was a loan rather than an investment. A reasonable jury could find substantial identity of management and supervision, or it could find the opposite.

A reasonable jury also could find either sufficient or insufficient identity of operations, customers, and business purpose to establish Fine Finishes as Kny Painting's alter ego. The evidence shows that a great many of Fine Finishes' employees, customers, and business contacts were formerly Kny Painting's as well, and that at least some of the means by which clients contacted Kny Painting were seamlessly transitioned over to Fine Finishes. Some employees received a paycheck

8

from Kny Painting one week and a Fine Finishes paycheck seven days later, as though their regularly scheduled compensation was simply being stamped with a different payor's signature. Kny was the primary contact for both companies and used his cellular telephone in his work for both companies, and the fax line that Kny Painting used was also used by Fine Finishes.

Yet other evidence shows that Kny and his father sold Kny Painting's store and disposed of its equipment when the company closed rather than using them for Fine Finishes. The record also shows that Kny Painting's business phone lines were disconnected upon the company's closure and that Fine Finishes received few incoming and sent zero outgoing faxes on Kny Painting's old fax machine. And although the fact that Kny never advertised Fine Finishes at all might suggest that Kny was capable of falling back on the business contacts Kny Painting had established, Kny's never having solicited business from Kny Painting clients might suggest to a jury that he did not intend to do so. Moreover, evidence and testimony in the record shows that the business purposes of the two businesses overlapped to some degree. At least some evidence exists that Kny Painting was capable of performing—and sometimes did perform—the very services that defendants contend are unique to Fine Finishes. Other evidence suggests that Kny Painting was neither able to nor interested in performing the finishing work that Fine Finishes later established as a core business purpose. The amount of weight to be accorded to any of this evidence is for a jury to determine.

Defendants contend that the evidence is undisputed that Kny had innocent motives for opening Fine Finishes. Kny's father stated in an affidavit that he chose to close Kny Painting because he no longer wished to work at his advanced age, he

9

wished to spend more time renovating a house he owned in Wisconsin, and his son did not wish to continue the company.  Kny testified during his deposition that he chose to open a new company because he wanted to strike out on his own and because he wanted his company to perform work Kny Painting had not previously performed, in locations Kny Painting had not previously serviced.  Defendants contend that this evidence, together with testimony stating that neither Kny nor his father ever expressed contempt for the Union or its representatives, proves that he did not possess unlawful motives.

This explanation is plausible and, together with all of the other evidence, would permit a reasonable jury to find in favor of the defendants.  But multiple Kny Painting and Fine Finishes employees testified to their recollection that Kny wanted to escape Kny Painting's CBA obligations.  Robert Siarny testified that when Kny told him that he was going to open Fine Finishes, he told Siarny the company would be non-union and indicated that he believed the new company would be able to do more business because it would be able to bid competitively in ways Kny Painting could not.  Gary Delwo, another employee of both entities, testified that Kny complained in December 2009 about union wages and benefits being too costly for Kny Painting to continue to operate.  Andrew Demopoulos, also an employee of both companies, testified in his deposition that he remembered hearing both Kny and his father saying that union wages or benefits were hurting Kny Painting's business.

The fact that none of these witnesses can recall the specifics of these conversations might affect the weight to be given to their testimony, but it does not affect the admissibility of the testimony.  *Cf. W. Indus., Inc. v. Newcor Canada Ltd.*, 739

F.2d 1198, 1202 (7th Cir. 1984) ("[A\ judge in our system does not have the right to prevent evidence from getting to the jury merely because he does not think it deserves to be given much weight."). Furthermore, it does not matter that none of these witnesses testified to Kny or his father expressing their distaste for the Union or its representatives; wanting to evade CBA obligations is not the same as disliking the Union or its representatives. Ultimately, admissible evidence in the record is sufficient to support a jury's reasonable inference that Kny's motives were impermissible, and that he chose to form Fine Finishes rather than continuing Kny Painting for the sole purpose of evading the company's obligations under the CBA. Simply put, genuine disputes persist as to facts material to the resolution of this case. The Court may therefore grant summary judgment in favor of neither plaintiffs nor defendants.

## Conclusion

For the foregoing reasons, the Court denies both plaintiffs' motion for summary judgment [dkt. no. 62] and defendants' motion for summary judgment [dkt. nos. 69]. A status hearing is set for February 10, 2016 at 9:00 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: February 3, 2016