**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS PENSION FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS WELFARE FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS SAVINGS FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS APPRENTICESHIP FUND; TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS SCHOLARSHIP FUND; and TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS JOINT JOINT COOPERATION TRUST FUND,** | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **vs.** | ) ) ) | **Case No. 14 C 6507** |
| **JOHN KNY PAINTING & DECORATING, INC., an Illinois corporation; FINE FINISHES & RESTORATION, INC., an Illinois corporation; and JOHN H. KNY, individually,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

MATTHEW F. KENNELLY, District Judge:

The trustees of six multi-employer fringe benefit funds sued John Kny Painting & Decorating, Inc. (Kny Painting), Fine Finishes & Restoration, Inc. (Fine Finishes), and John H. Kny, alleging that they violated the Employee Retirement Income Security Act of 1974 (ERISA). Plaintiffs alleged that Kny closed Kny Painting and opened Fine Finishes in its stead for the sole purpose of evading Kny Painting's obligations under a

collective bargaining agreement.

The Court previously denied both parties' motions for summary judgment. *See Trs. of the Chi. Painters & Decorators Pension Fund v. John Kny Painting & Decorating, Inc.*, No. 14 C 6507, 2016 WL 406328 (N.D. Ill. Feb. 3, 2016). The Court conducted a bench trial on March 25–29, 2016. This constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

**Facts**

Kny's father incorporated Kny Painting in 1976 and launched the company in 1979. Around the same time, Kny joined his father's company. He started at Kny Painting as a part-time helper while still in high school, but after graduating in 1980, Kny began to work full-time as a painter. From 1981 until it ceased operations in 2010, Kny Painting was a signatory to successive versions of a collective bargaining agreement (CBA) with Painters' District Council #14 (the Union). Each iteration of the CBA required the company to pay certain wages and make contributions to fringe benefits funds for Kny Painting's employees. Kny Painting last bound itself to the CBA for a five-year term running from June 1, 2007 through May 31, 2012.

Kny's father was the company's founder, sole owner, and sole shareholder, and he remained the sole owner and shareholder throughout the company's existence. As the years passed, however, Kny began to take on more responsibility in his father's business. In 1988, Kny was authorized to sign his father's name to a memorandum agreement binding Kny Painting to the CBA. In 1998, Kny assumed the presidency of Kny Painting from his father, at which time the company's business address was changed to Kny's home address. Kny also stopped working as a painter and began

estimating and preparing bids for the company, paying its bills, ordering supplies, invoicing, preparing payroll, and supervising the company's workforce.

Kny's father, meanwhile, started to take a lesser role in the company. He began drawing a pension in 1994, which required him to work fewer than thirty-nine hours per week in the finishing industry. (Kny testified at trial that his father sometimes worked more than this and sometimes worked far less.) Kny's father also became less visible, both to Kny Painting employees and to the outside world. One former Kny Painting employee, Paul Polinski, testified that he began to perceive Kny as his supervisor around 1995. Andrew Demopoulos, another former Kny Painting employee, testified that it was Kny, not his father, who hired him in 1996; Gary Delwo said the same about his hiring in 1997, as did Felipe Diaz and Robert Siarny about their hiring in 2000.

At least as early as when he took over as president in 1998, Kny was the primary point of contact for Kny Painting clients and customers, manning the company's business telephone line from his home and giving his personal cellular telephone number to more important or demanding clients who wanted to reach him. Scott Himmel, an architect and engineer who works in interior design and interior architecture, testified that in his first experiences working on projects with Kny Painting in 2001 and 2003, he was only ever familiar with Kny and did not know anything about Kny's father. From 2005 on, Kny's father did not receive a salary from Kny Painting, and Polinski and Demopoulos viewed Kny as their sole supervisor and manager. Polinski testified that during this time, he saw Kny's father at worksites roughly once per month on what appeared to be social visits; Delwo testified that when he visited every few weeks, Kny's father was always accompanied by his son, who seemed to be the one truly in charge.

This is not to say that Kny's father was completely uninvolved in the business. Kny testified that every decision he made on behalf of Kny Painting, both before and after he became president, was subject to his father's approval. Errol Boyd, an artist Kny hired to Kny Painting in or around 2006, testified that he made Kny's father's acquaintance shortly after he was hired, when Kny's father was making the rounds at a job site. Boyd stated that Kny's father visited job sites (with Kny) to evaluate the company's work on a weekly or biweekly basis and that he made it clear when he met Boyd that he had reviewed Boyd's portfolio of work during the hiring process. Delwo, meanwhile, testified that he was deferential when Kny's father visited a job site because Kny's father was "the boss." And although none of the witnesses was privy to the ownership structure of Kny Painting, Kny's father was always the only owner of the company. But it was Kny who signed Kny Painting's lease for its shop in Buffalo Grove in 1999, purchased a shop space in Wheeling for the company in 2005, and wrote checks to the company when it struggled to make payroll between 2006 and 2009. Kny testified that he considered those checks to memorialize loans to Kny Painting, but acknowledged that the company only sometimes repaid them.

After 1998, Kny was also responsible for submitting Kny Painting's membership applications to the Finishing Contractors Association. These applications required Kny Painting to indicate what type of work it performed. On an application dated January 22, 2007, Kny indicated that Kny Painting performed residential "wallcovering," "fine decorating," "wood refinishing," "staining," and "all faux". Pls.' Ex. J. In another application dated March 20, 2007, Kny indicated that Kny Painting performed residential "wallcovering" and "any + all types of faux". *Id.* In an application dated February 12,

2008, Kny indicated that Kny Painting performed residential "wallcovering," "fine decorating," and "application of silks or murals[,] wood finishing/strip/wax, all faux, plasters, guilding [sic]". *Id.*

According to a competitor familiar with the company's work, another member of the painting and decorating community, and former Kny Painting employees, Kny's representations on these applications accurately summarized the work Kny Painting performed and was known to perform. Jeffrey Hester, vice-president and co-owner of Hester Decorating (and a Fund trustee), testified credibly that his company competed directly with Kny Painting for over twenty years. He described the scope of his company's work in high-end residential painting, wallpapering, and finishing, and described other work like faux finishing (including venetian plastering), wood varnishing, wood distressing, and glazing and painting floors. He also testified that because Hester Decorating and Kny Painting were the two big players in high-end residential painting, Kny Painting submitted bids on roughly half of the high-end residential jobs that Hester obtained.

Scott Himmel testified that he had his first experience with Kny Painting in the early 2000s, when one of his clients wanted Kny Painting to do the painting on a multi-million dollar renovation to a large high-end high-rise residence. Kny Painting provided faux wood paneling, lightly glazed finishes, and wallcovering services. In 2003, Himmel served as an advisor to a client whose apartment had flooded. On Himmel's recommendation, the client's insurer brought Kny Painting in to paint the residence. Himmel testified that if he were making a list of the top five high-end residential painters in Chicago, both Kny Painting and Hester Decorating would have to be on the list.

Numerous former employees also testified regarding the scope of the work they performed while working for Kny Painting. Demopoulos worked as a painter and did some faux finishes. He testified that he did not ever do venetian plastering or wood finishing, and he was not sure whether others did such work for Kny Painting. Polinski, a forty-year member of the Union who worked for Kny Painting from 1985 through 2009, testified that he saw Kny Painting employees perform wood finishing, venetian plastering, faux finishing, and staining and varnishing of handrails, walls, and floors. He also testified that he performed these types of tasks from time to time as a Kny Painting employee, though his primary task was hanging wallpaper. Boyd performed painting, wood graining, color mixing, and glazing. He also occasionally did gilding work. Delwo and Siarny both testified that they did residential painting for Kny Painting, and Diaz testified that he painted and did wood staining for Kny Painting.

All of this work fell within the scope of work outlined in the CBA. Pursuant to section 9 of the CBA, "work done by employees in the bargaining unit" was worded very broadly and included, but was not limited to:

> (a) **Materials.** All work regarding the use, application, cleaning, washing, bleaching, or removal or paints, pigments, binders, extenders, thinners, dryers, primers, sealers, oil paints, enamels, chemical and epoxy coatings, water colors, emulsions, clear coatings, waxes, stains, oils, varnishes, mastics, plastics, urethanes, Adhesives, foams, seamless and tile-like coatings, cement enamels and other special coatings, sheet, rubber and other linings, protective or decorative ceiling or wall coverings (including, but not limited to, carpeting and soft wall materials), and decorative textures on all surfaces, lead paint removal and abatement of toxic substances, coatings and coverings and venetian plastering.

> (b) **Application.** The application of all materials, regardless of trade name markings or method, to all ceilings, interior or exterior walls, floors, roofs, foundations, windows, doors, frames, screens, building trim (wood or metal), streets[,] sidewalks, fire escapes, pipes and pipe coverings, radiators, light poles, power and any other type of tower, tanks, vats,

pavement, parking lots, guard rails, bridges, or any other surfaces or structures for the purpose of decoration, washing, cleaning, identification, or protection, including fireproofing, damp proofing, water proofing, insulation, or rust preventions, sound proofing, mold remediation and drywall taping and finishing.

Pls.' Ex. H, at 136.

In 2009, Kny's father decided it was time to retire fully.  By Kny's account, his father said that he would retire at the end of the year, and he asked if Kny would like to continue Kny Painting.  After giving the question some consideration, Kny declined his father's offer to continue Kny Painting, opting instead to start a new company.  During his trial testimony, Kny identified numerous factors that he said motivated his decision to start his own company rather than taking ownership of and continuing Kny Painting.  He explained that he wanted to make a name for himself and start his own endeavor.  He also stated that he had developed new and different interests over his years working and learning on the job, and he wanted his new company to offer services that Kny Painting had not offered.  Specifically, Kny wanted his new company to offer advanced and unique finishing services, and he wanted to be able to offer services in a broader geographic area than he said Kny Painting serviced.  Although Kny Painting had personnel that might be able to do or learn how to perform the new services he envisioned, Kny said he felt constricted by Kny Painting's good reputation as a high-end painting company and wanted to open a company whose reputation he could develop from scratch.  Similarly, although it was possible for Kny Painting to do work outside of the Chicagoland area (and, as Diaz testified, it had done so on at least one occasion in the past), Kny said his father did not want the company traveling, and Kny felt burdened by the company's reputation as a Chicago-bound contractor.  Kny also testified that he

did not decline his father's offer to continue Kny Painting as a means of avoiding Kny Painting's obligations under the CBA.

Kny incorporated Fine Finishes in October 2009, registered the company at his home address—which, at the time, was also Kny Painting's business address—and opened a P.O. box for the new company.  He also began discussing the future with some Kny Painting employees.  For example, Kny and his father met privately with Delwo at a jobsite in Highland Park in December 2009, where Delwo recalls them telling him that "John Kny Painting and Decorating would no longer exist and we're moving on, it was going to be non-union, and they wanted me to come with."  At some point, Kny and his father also met with Boyd at a jobsite in Lake Forest.  Boyd was told that Kny Painting was closing, Kny was starting a new company, and the company would be non-union.  Siarny testified that he was not told Kny Painting was going out of business, but he saw the writing on the wall when people began to lose their jobs.  He also testified that while he was working on a job at the Drake Hotel in December 2009, Kny told him he was starting a new, non-union company.

By November 2009, Kny Painting was no longer making bids on new projects. When potential clients would call Kny requesting that Kny Painting bid on a job, Kny would inform them that Kny Painting was closing and would not be able to bid and that he was starting a new company that would be willing and able to bid instead.  Delwo and Siarny performed Kny Painting's last job, working at the Sacks residence in early January 2010.  But when Kny Painting officially ceased operations two weeks into January 2010, Delwo and Siarny continued working at the Sacks residence without interruption, but now as employees of Fine Finishes, which, based on their credible

testimony, completed the Sacks job.  Diaz also testified that he took a weeklong
vacation at the end of December 2009 as he did most years, except this time he left as
an employee of Kny Painting and returned as an employee of Fine Finishes.
Demopoulos and Boyd also joined Fine Finishes.  Kny hired five other people to join the
team at Fine Finishes:  Chris Guerrieri, a former Kny Painting employee; Brendan
Sanders, who had worked as an independent contractor driving trucks for Kny Painting;
Rolando Hernandez, whom Sanders recommended; and Diaz's two children, Gerardo
and Eduardo Diaz.

Kny Painting closed its doors in early 2010.  Kny's father notified the Union that
Kny Painting was permanently closing and that final paychecks would be issued in short
order.  Kny Painting's fax line remained functional for two more years—Kny claimed this
was an oversight—but its official business phone number and e-mail were disconnected
by February 2010.  That month, Kny and his father cleaned out the Wheeling shop
space and discarded all of the equipment housed there; they kept paints and thinners,
but disposed of other equipment and the company's desktop computers.  Kny's father
took some of the company's ladders to his home in Wisconsin, where he was living and
working on a personal renovation project.  All of Kny Painting's accounts with vendors
were closed.  Kny Painting's accountants performed a final audit in June 2010.

Fine Finishes, meanwhile, began servicing clients in December 2009.  Kny never
advertised the opening of Fine Finishes, so many of its early jobs were for clients who
found the company calling Kny on either the Kny Painting business line or Kny's
personal cellular phone to solicit a bid from Kny Painting.  Fine Finishes' first job was for
Andrew and Courtney Berlin in Glencoe, Illinois.  Andrew's parents, Melvin and Randy

Berlin, were former customers of Kny Painting, but Andrew and Courtney were new clients Kny had not previously known.  This job, too, was obtained via a call made to seek out Kny Painting.  Arthur Dunnam, a designer Andrew and Courtney had hired (and who had worked with Kny on Kny Painting's job for the senior Berlins), called Kny in November 2009 to arrange for Kny Painting to bid on the project.  Kny returned Dunnam's call and informed him that his father had retired, the company was closing at the end of the year, and Kny's new company would be pleased to bid on the job.  When Fine Finishes was selected to perform the work, Dunnam called Kny and told him to meet Courtney in Glencoe to receive a $25,000 check as down payment for the job.  Kny immediately drove to Silver Lake, Wisconsin, to deposit the check in a new Fine Finishes checking account at the People's Bank, where he had a personal home equity line of credit but where Kny Painting had never had a banking relationship.  It was at this juncture that Kny also purchased insurance for Fine Finishes, the premiums for which he says were much higher than they had been for Kny Painting due to Fine Finishes being a new company with no established history.  On behalf of Fine Finishes, Guerrieri, Felipe Diaz, and Hernandez performed restoration, painting, and wallpapering for the junior Berlins.  Later, Fine Finishes placed other bids on work for the junior Berlins, and it performed restoration work, plastering, and decorative finishes for them.

The company's second project took place at Harold Smith's residence in Lake Geneva, Wisconsin, beginning in January 2010.  Like the Berlins, Smith found Fine Finishes by placing a call seeking out Kny Painting:  a decorator working for Smith called Kny and left a message asking Kny Painting to submit a bid on intricate wood finishing work in Smith's personal library.  Kny returned the call and informed Smith's

decorator that Kny Painting was closing but that he was opening Fine Finishes and would be happy to submit a bid on his new company's account. Fine Finishes won the job and completed it, and the company submitted numerous subsequent bids on work in the Smith home that continued through July 2011. Kny testified that a similar back-and-forth between him and former Kny Painting clients led to work for Fine Finishes at numerous other residences. These included the residences of Anthony Dean, who enlisted Fine Finishes to do interior and exterior painting at his Long Grove residence and wood staining and preservation work on a cedar barn elsewhere; Elizabeth Cheval, who hired Fine Finishes to complete a porch addition to her home; Richard Klarcheck, who brought in Fine Finishes to apply base paint for European craftsmen to contribute unique mural work; Suzanne Searle Dixon, for whose residence Fine Finishes refinished wooden floors and performed basic painting work; and Lori Newman, who enlisted Fine Finishes to manage a window restoration project in her home in the Drake Tower. In Fine Finishes' first year of existence, it serviced roughly fifty-five clients. At least twenty-five of those clients were former Kny Painting clients.

Plaintiffs became aware that Kny was operating Fine Finishes in early 2010 when Hester made complaints to the Funds. Hester knew that Kny Painting had gone out of business, and he was under the impression that Kny was no longer working in high-end residential painting. He filed his first complaint with the Union when he visited a residence on North Lakeshore Drive and saw that a worker who had worked for Kny had signed in to visit the residence on behalf of "FFR," an acronym whose meaning Hester did not yet know. Later, Hester filed a complaint with the Union after seeing Kny's employees working down the road while on a job in Glencoe. Hester became

concerned that Kny was continuing Kny Painting under a different name, a suspicion he developed because he found himself bidding against Kny's new company for the type of work for which he had previously bid against Kny Painting.

In fact, even Fine Finishes' employees perceived strong similarities between Kny Painting and Fine Finishes. Kny acknowledged that the vast majority of the work Fine Finishes performed at the outset, and the majority of Fine Finishes' work even to this day, was high-end residential painting. Felipe Diaz testified that over eighty percent of his work for Fine Finishes, even now, is traditional painting work of the type he performed as a Kny Painting employee. And in a conversation near a job site in 2014, Delwo recalls telling someone that he was working for "Fine Finishes Restoration, Inc., formerly known as John Kny Painting and Decorating."

Alleging that Fine Finishes was merely a disguised continuance of Kny Painting that Kny established to evade Kny Painting's obligations under the CBA, Plaintiffs brought suit against Kny Painting, Fine Finishes, and Kny personally in August 2014.

## Discussion

Under ERISA, the administrators of funds like those in this case may bring suit to recover delinquent contributions that a signatory to a collective bargaining agreement has failed to pay. *See* 29 U.S.C. §§ 1132, 1145. It is undisputed that Fine Finishes was not a signatory to any collective bargaining agreement. What is disputed is whether Kny Painting's obligations under the collective bargaining agreement may be imputed to Fine Finishes as Kny Painting's alter ego and whether plaintiffs may pierce Fine Finishes' corporate veil to hold Kny individually liable for unpaid contributions to the funds.

**A.      Whether Fine Finishes is Kny Painting's alter ego**

Section 8(a)(5) of the National Labor Relations Act makes it "an unfair labor

practice for an employer . . . to refuse to bargain collectively with the representatives of

his employees."  29 U.S.C. § 158(a)(5).  Section 9(a) of the Act dictates:

> Representatives designated or selected for the purposes of collective
> bargaining by the majority of the employees in a unit appropriate for such
> purposes, shall be the exclusive representatives of all the employees in
> such unit for the purposes of collective bargaining in respect to rates of
> pay, wages, hours of employment, or other conditions of employment.

*Id.* § 159(a).  "A union may achieve the status of a majority collective bargaining

representative through either Board certification or voluntary recognition by the

employer."  *Raymond F. Kravis Ctr. for Performing Arts, Inc. v. NLRB*, 550 F.3d 1183,

1188 (D.C. Cir. 2008).  Once a union achieves section 9(a) status and negotiates terms

of employment for the company's employees, the company is required to recognize the

union's status as the employees' representative until the union no longer enjoys the

support of a majority of the company's employees.  This is true even after the CBA

expires.  *See Staunton Fuel & Material, Inc.*, 335 NLRB 717, 718 (2001) ("[A] 9(a)

relationship (and the employer's associated obligation to bargain) continues after

contract expiration, unless and until the union is shown to have lost majority support.");

*Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 786–87 (1996).

This raises the question:  what can a company do if the terms of the CBA it

signed require it to pay wages and benefits that are unsustainable or pose a threat to

the long-term viability of the company?  It cannot simply walk away from the CBA or

refuse to sign a new one when it expires, for an employer is obligated to negotiate in

good faith with a section 9(a) representative.  It can, however, take one of two possible

paths. One permissible path is to attempt to show that the union no longer enjoys majority support. A union with section 9(a) status enjoys the benefit of "a conclusive presumption of majority status during the term of any collective-bargaining agreement, up to three years." *Auciello Iron Works*, 517 U.S. at 786. This conclusive presumption is "based not so much on an absolute certainty that the union's majority status will not erode" as on the need to maintain "stability in collective-bargaining relationships" and permit the union to focus its energy on reaching and administering an agreement with the employer. *Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 38 (1987) (internal quotation marks omitted). After the agreement expires—or, if the agreement's term is longer than three years, after three years have passed—a union with section 9(a) status enjoys a rebuttable presumption of majority support. The employer can rebut the presumption by presenting evidence that the union no longer enjoys majority support. *See Levitz Furniture Co.*, 333 NLRB 717, 723 (2001); *Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 361 (1998).

The other path is to negotiate, either for more manageable terms or to a legal impasse. The employer can explain its position to the union and attempt to negotiate in good faith to bring down costs in the next iteration of the CBA. An employer has an obligation to negotiate and bargain in good faith with a union that has section 9(a) status, but it is not required to give up on its proposals to comply with the demands of an intractable union. "Because an employer is only required to bargain in good faith and may ultimately refuse to amend its proposals, once impasse has been reached the employer may implement its original proposals without violating the Act." *Naperville Ready Mix, Inc. v. NLRB*, 242 F.3d 744, 755 (7th Cir. 2001). The employer may

continue to implement his proposals unless and until the parties, negotiating in good faith, come to an agreement to terms that are suitable to both.

What an employer may not do, however, is declare the company defunct in order to escape its obligation to bargain with the union and abide by the negotiated CBA, only to then resume operations under a different corporate title. When a company does this, the second company can be held to account for the obligations the first one avoided by dishonestly declaring itself closed. This is precisely what plaintiffs in this case contend that Kny Painting did. They claim that to avoid the requirements of the CBA, Kny Painting was shuttered and reopened as Fine Finishes—functionally the same company, but not operating under the CBA.

Although not a signatory to any CBA, Fine Finishes may be bound by Kny Painting's CBA if Fine Finishes is found to be Kny Painting's alter ego. Alter ego liability "focuses on the existence of a disguised continuance of a former business entity or an attempt to avoid the obligations of a collective bargaining agreement." *Int'l Union of Operating Eng'rs, Local 150, AFL–CIO v. Centor Contractors, Inc.*, 831 F.2d 1309, 1312 (7th Cir. 1987) (quoting *Penntech Papers, Inc. v. NLRB*, 706 F.2d 18, 24 (1st Cir. 1983) (internal quotation marks omitted)). This is a fact-intensive inquiry that requires a finder of fact to consider numerous relevant factors, including "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." *Int'l Union of Operating Eng'rs, Local 150, AFL–CIO v. Rabine*, 161 F.3d 427, 433 (7th Cir. 1998). Intent to evade union obligations, though not the keystone to proving alter ego in some other circuits, is the most critical factor in the Seventh Circuit. *Compare Trs. of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW Local 701*

*v. Favia Elec. Co.*, 995 F.2d 785, 789 (7th Cir. 1993) (quoting *Centor Contractors*, 831

F.2d at 1312), *with Rd. Sprinkler Fitters Local Union No. 669, U.A., AFL–CIO v. Dorn

Sprinkler Co.*, 669 F.3d 790, 794 (6th Cir. 2012) (holding that intent to evade collective

bargaining obligations is merely one factor among many that must be considered).

### 1.      Ownership, management, operation, and supervision

The evidence presented at trial shows that the ownership structures of Kny

Painting and Fine Finishes were distinct.  Plaintiffs point to the fact that Kny wrote

checks to Kny Painting as indicia that he had invested, and therefore had an ownership

interest, in his father's company.  They also emphasize that clients, vendors, and

general contractors were often unaware of Kny's father's existence, much less his

involvement with the company Kny appeared to control.  All of this is, to a degree,

relevant to the question of the company's management and operation.  But the evidence

does not show that Kny had an ownership interest in Kny Painting or that the ownership

structure of Fine Finishes was substantially identical to that of Kny Painting.  Kny's

father owned Kny Painting in full, and Kny owned (and continues to own) Fine Finishes

in full.

On the other hand, the evidence presented at trial establishes that the day-to-day

management of Fine Finishes was substantially identical to that of Kny Painting.  At its

inception, Fine Finishes was managed in every material respect by Kny.  Kny estimated

all jobs and placed all bids on behalf of Fine Finishes, and he was responsible for hiring

and firing all personnel.  He managed Fine Finishes' finances, depositing checks into its

bank account and serving as the primary point of contact for clients, general

contractors, insurers, vendors, and the company's bank.

Kny likewise estimated all jobs and placed all bids on behalf of Kny Painting from at least as early as 1998 until the company's closure in 2010. Kny testified that there was a substantially different management scheme at Kny Painting because every decision he made was subject to his father's input and approval, and that the two of them were in almost constant consultation on every management decision. But that claim was not supported by credible evidence. Both Kny's own testimony (inferentially) and the credible testimony of others indicate that Kny's father was barely, if at all, involved in the company's management in its later several years. Kny's father began drawing a pension in 1994 and never had any trouble continuing to draw that pension over the years to come, which means the Union never became aware of a time in the sixteen years between his pension request and his official retirement during which Kny's father worked more than thirty-nine hours in a week. Hester, a manager of a substantially similar competitor company, credibly testified that it would be virtually impossible to serve in a management capacity for a company like his while working fewer than thirty-nine hours per week. Indeed, Kny's father did not even receive compensation for whatever work he was performing for Kny Painting after 2006. Moreover, for the last several years of Kny Painting's existence, it was Kny, not his father, who made financial contributions to the company, and from the mid-1990s on, it was Kny who hired new personnel. Kny insisted that he consulted his father on all of these decisions, but he also testified that his father moved out of the state and played a significantly diminished role in the company's later years. The weight of the evidence supports the inference that Kny Painting's management structure was substantially identical to that of Fine Finishes, with Kny singularly at the helm.

There appears also to have been substantial identity of operations between Kny Painting and Fine Finishes. It is true that Kny opened a new bank account at a new bank for Fine Finishes and that he closed all of Kny Painting's vendor accounts and opened new ones for Fine Finishes. But Kny otherwise relied in large part on preexisting infrastructure and relationships to form the new corporate entity. Fine Finishes used many of the same vendors Kny Painting had used, and only one of Fine Finishes' vendors required it to demonstrate creditworthiness. The reasonable inference is that they did so because Kny was a known commodity due to his dealings with the same vendors on behalf of Kny Painting. When Fine Finishes opened for business, it employed Kny, six former Kny Painting employees, and four others who were either brought in on those employees' recommendation or had worked as independent contractors with Kny Painting in the past. The company ran so similarly, in fact, that one of its own employees referred to it as "Fine Finishes Restoration Inc., formerly known as John Kny Painting and Decorating."

Clients interacted with Kny in precisely the same way when he represented Kny Painting as they did when he represented Fine Finishes. Employees did too, reporting to him and receiving assignments from him. In fact, the operations were so seamlessly transitioned from Kny Painting to Fine Finishes that Siarny and Delwo both testified credibly that they worked on a single job (the Sacks residence) as employees of Kny Painting one week and Fine Finishes the next. Felipe Diaz similarly took a scheduled week off between his last day at Kny Painting and his first at Fine Finishes, never missing a paycheck even when he received one from Kny Painting one week and Fine Finishes the next. All of this tends to show that Kny Painting and Fine Finishes shared

identity of operations.

The evidence presented at trial also supports the inference that substantially identical supervision was applied to work performed by Kny Painting and Fine Finishes. According to every one of the painters who testified at trial, job foremen supervised job sites where employees of each company performed work, and Kny served as the sole supervisor outside of job sites for both companies. For both Kny Painting and Fine Finishes, Kny interviewed employees and informed them they had been hired, and employees reported directly to Kny when they were on jobs. Kny visited job sites frequently to check on their progress, and although Kny's father sometimes visited with him for Kny Painting jobs, employees were largely consistent in their testimony that they perceived Kny's father's visits as mostly social and that Kny remained the sole supervisor of Kny Painting's employees.

### 2. Equipment

Kny retained some of the supplies Kny Painting possessed at the time it was wound down, but he disposed of most of Kny Painting's equipment when the business closed. Kny disconnected Kny Painting's telephone line, closed its shop, and left many of its supplies for scavengers. He also disposed of the company's desktop computer. Upon founding Fine Finishes, Kny purchased a business cell phone and a new laptop computer to use for submitting bids on behalf of the new company. He opened a new bank account at a bank Kny Painting had not used, opened a new e-mail account for the company, and purchased business cards and letterhead for Fine Finishes.

It is worth noting, however, that some significant equipment Kny used as president of Kny Painting continued to be used to facilitate Fine Finishes' business.

First, Kny used his personal cellular phone as a secondary means of contact for customers of both companies. The evidence shows that in the last few months of Kny Painting's existence, customers seeking Kny Painting's services would call Kny on that phone, and Kny would funnel business to his new company. And although Kny activated a business phone line shortly after opening the company, he never advertised his business or his phone number, and he did not list the number in the phone book. As a result, any business calls Kny received in the early going of Fine Finishes were to a phone line that clients used to contact Kny Painting.

Kny also continued to use Kny Painting's fax machine and fax line at Fine Finishes for quite some time. Kny testified that Fine Finishes never received faxes on Kny Painting's fax machine or fax number, but this is not important—Fine Finishes continued to use Kny Painting's fax line, even if its customers did not. One fax entered into evidence shows a bill sent in May 2010 on Fine Finishes letterhead from the Kny Painting fax line, with a fax notation in the top left corner listing the fax as coming from "JOHN KNY PAINDDD"; another from March 2011 shows the fax was from "JOHN KNY". In fact, although Kny stated that his failure to disconnect Kny Painting's fax line was an oversight, the evidence shows that even as late as January 2014, Kny Painting's fax number continued to be listed on Fine Finishes' letterhead as a means of contacting Fine Finishes.

### 3. Customers

The evidence showed that a substantial number of Fine Finishes' customers were the same customers that Kny Painting serviced, and another group of customers were referrals from Kny Painting customers or customers who found Fine Finishes prior

to Kny Painting's closure.  All told, over sixty percent of Fine Finishes' customers during its first year of operation were either Kny Painting customers or had tried to be (customers who contacted Kny seeking Kny Painting, while Kny was still president of that company).  Similarly, Fine Finishes established working relationships with many of the same entities that serviced Kny Painting.  Fine Finishes hired the same accountants and law firm that Kny Painting used.  It also set up new accounts with the same vendors with whom Kny Painting had accounts, and, as mentioned above, only one of those vendors required Kny to demonstrate Fine Finishes' creditworthiness.

Kny emphasized during his deposition, at summary judgment, and during his trial testimony that he never advertised Fine Finishes in any way.  He seems to contend that this demonstrates that he did not seek to retain Kny Painting's customers when he opened his new business.  But the opposite is true.  This evidence shows, and the Court finds based on the credible testimony at trial, that Kny relied on Kny Painting's and his own reputation with vendors and clients to build Fine Finishes.  In other words, Kny's choice not to advertise supports the proposition that he built his new company from established relationships with Kny Painting's vendors and clients.

### 4.    Business purpose

Kny testified that the primary reason he chose to open his own new company rather than continue his father's company was that he wanted to run a company with a broader scope of work, both in terms of business purpose and geographic territory. Specifically, Kny testified that having learned various advanced wood finishing, plastering, and carpentry techniques over the years, he hoped his new company would provide these new services over and above the painting and finishing services that Kny

Painting performed.  He also testified that he wanted Fine Finishes to provide high-end residential painting and finishing services in a larger geographic territory than Kny Painting had serviced.  Kny Painting, he said, primarily serviced the Chicagoland area, and his father was strongly opposed to providing services outside of that territory; Fine Finishes, on the other hand, was established to service Chicago, Indiana and Wisconsin, and other geographic areas.

The weight of the evidence, however, supports the inference that contrary to Kny's testimony, Fine Finishes' business purpose was substantially identical to Kny Painting's.  For one thing, nobody Kny hired to work at Fine Finishes brought any new skills to Fine Finishes that they or others did not possess as employees of Kny Painting. None of the employees who transitioned from Kny Painting to Fine Finishes took any time between jobs to learn new skills or techniques, and the few employees who were not former Kny Painting employees did not possess any special skills that allowed them to perform work Kny Painting could not have performed.  Additionally, every one of the Fine Finishes employees who testified stated that the vast majority of the work they performed for Fine Finishes was work they performed for Kny Painting, and that virtually all of the work was work that Kny Painting was capable of performing.  Even Kny testified that seventy-five percent of the work Fine Finishes did in its first year of work was traditional painting and paper-hanging that Kny Painting could have performed. Kny testified that Fine Finishes provided venetian plastering and mural work whereas Kny Painting never did, but the applications to the Finishing Contractors Association that he submitted for Kny Painting belie this testimony.  Boyd, who testified that his work was substantially different because he performed mural work at Fine Finishes and not at

Kny Painting, was impeached with deposition testimony in which he stated that Kny Painting could do all of the things Fine Finishes could do—including, presumably, the mural work Kny represented the company could perform in an application to the Finishing Contractors Association.

Finally, the evidence shows that Fine Finishes only rarely operated outside of the Chicagoland area, exactly as Kny Painting had. Of the 110 jobs Fine Finishes has completed since January 2010, only six were done in geographic areas that Kny Painting had not previously serviced. At least half of those jobs were for clients for whom Kny Painting had previously done work. In fact, as Kny testified, when those clients called to request work at their out-of-state residences, they did so believing that they were calling Kny in his capacity as president of Kny Painting. And they were justified in believing that Kny Painting would be willing to do such work, as Kny Painting had previously done work in Michigan and Arkansas.

During Kny's testimony, plaintiffs' counsel asked a series of questions to determine what work Fine Finishes performs that is not covered under the CBA's scope of work provision. Kny listed carpentry, antique restoration, out-of-state travel, client consultation, wood finishing, and high-end finishes. But carpentry, antique restoration, wood finishing, and high-end finishes all fall within the CBA's scope as provided in section 9 of the agreement. Likewise, client consultation relating to this type of work is also expressly included as covered work under the CBA. Although it is technically true that out-of-state travel is not included in the scope of work provision of the CBA, it also is not a stand-alone service that Kny Painting provides. Rather, it is a means to perform CBA-covered work farther away from the company's home base than it otherwise would

perform. Simply put, the work that Fine Finishes performs falls directly within the scope of work provision of the CBA, just like Kny Painting's portfolio of work. The evidence supports the inference that Fine Finishes' business purpose is substantially identical to Kny Painting's business purpose: high-end residential painting and finishing.

### 5. Unlawful motive or intent

At trial and during his deposition, Kny stated that he had two primary motivations to start a new company. First, he wanted to step out from his father's shadow and build his own enterprise from the ground up. Second, he wanted to build a company that would provide new services in new places and would be unconstricted by his father's company's reputation.

The Court does not find support for this testimony in the credible evidence offered at trial. For one thing, the evidence does not show that Kny was operating in his father's shadow at all. Nobody who did business with or worked for Kny Painting was aware of the company's ownership structure, and many clients and outside vendors did not even know that Kny's father existed. Himmel and Leslie West, a person who had done business with Kny Painting and Fine Finishing, both testified that they held Kny's companies in high esteem in large part because of Kny's personal reputation, not his father's. The evidence also does not show that Kny Painting's reputation kept it from being solicited for the type of work Fine Finishes performed or for jobs outside of the Chicagoland area.

The crux of the alter ego inquiry is intent to avoid obligations imposed by a collective bargaining agreement. The circumstantial evidence detailed above supporting the inference that Fine Finishes and Kny Painting had substantial identity of

management, operations, supervision, customers, and business purpose, lends

credence to the notion that Fine Finishes was formed to avoid Kny Painting's obligations

under the CBA.  Direct evidence presented at trial does so as well.  Numerous

employees of the two companies testified that the first thing they ever learned about the

new company was that, unlike Kny Painting, Fine Finishes would be non-union.  More

importantly, Kny himself testified that Union costs were a motivating factor in his

decision not to continue Kny Painting:

> THE COURT:  So you indicated that you do recall or you did not deny
> saying to employees of John Kny painting that costs were a factor.
>
> [KNY]:  Yes.
>
> THE COURT:  Okay.  Did you ever say to any of those employees in
> these words or any other words in sum or substance that what it was
> about costs or factors were the costs that existed as a result of the union
> contract, the fact that there was a pension, high end, the union benefits.
>
> [KNY]:  Yes.

Having considered all of the evidence, the Court concludes that Kny formed Fine

Finishes for the purpose of evading Kny Painting's obligations under the CBA.  Because

the Court finds that Fine Finishes and Kny Painting were substantially identical and that

Fine Finishes was formed with the intent to evade union obligations, the Court

concludes that Fine Finishes is the alter ego of Kny Painting for purposes of the

contribution payments plaintiffs seek.

**B.      Piercing the corporate veil**

Plaintiffs wish to hold not only Fine Finishes accountable for Kny Painting's

delinquent contribution payments, but also Kny himself on a veil-piercing theory.  "Veil-

piercing is an equitable remedy governed by state law," here the law of Illinois because

that is where both corporations at issue were incorporated.  *Laborers Pension Fund v. Lay-Com, Inc.*, 580 F.3d 602, 610 (7th Cir. 2009).  "A corporation exists separately from its shareholders, officers, directors and related corporations, and those individuals and entities ordinarily are not subject to corporate liabilities."  *Id.*  An exception exists, however, when an "individual or entity uses a corporation merely as an instrumentality to conduct that person's or entity's business."  *Fontana v. TLD Builders, Inc.*, 362 Ill. App. 3d 491, 500, 840 N.E.2d 767, 775–76 (2005).  Illinois courts permit veil-piercing "where: (1) there is such a unity of interest and ownership that the separate personalities of the corporation and the parties who compose it no longer exist, and (2) circumstances are such that adherence to the fiction of a separate corporation would promote injustice or inequitable circumstances."  *Buckley v. Abuzir*, 2014 IL App (1st) 130469 ¶ 13, 8 N.E.3d 1166, 1170 (2014) (quoting *Tower Inv'rs, LLC v. 111 E. Chestnut Consultants, Inc.*, 371 Ill. App. 3d 1019, 1033, 864 N.E.2d 927, 941 (2007) (internal quotation marks omitted)).

The only evidence plaintiffs put forward to support their contention that Kny abused Fine Finishes' corporate form was that he sometimes used company money to pay for personal expenses and that sometimes he and his wife used their personal credit cards to make purchases in the company's name.  But Alan Kalfen, Fine Finishes' accountant, testified credibly that his company reconciled Fine Finishes' books each month, separated such expenditures out, and ensured that they were marked and reported correctly.  He also testified that it is neither inappropriate nor uncommon for people to use their personal credit cards for business purposes.  Without more, this is not sufficient to prove by a preponderance of the evidence that Kny and Fine Finishes

do not have separate identities and that holding otherwise would promote injustice or be otherwise inequitable.

## Conclusion

For the foregoing reasons, the Court directs the Clerk to enter judgment in favor of plaintiffs and against defendants John Kny Painting & Decorating, Inc. and Fine Finishes & Restoration, Inc. on count 1 of plaintiffs' amended complaint (alter ego), and in favor of defendant John H. Kny and against plaintiffs on count 2 of the amended complaint (piercing the corporate veil). *See* dkt. no. 49-5 (amended complaint). In a joint stipulation submitted to the Court, the parties agreed to the following:

> Plaintiffs and Defendants, therefore, stipulate that, in the event of a legal determination that Fine Finishes & Restoration had an obligation to contribute to the Plaintiff Funds under the Painters District Council #14 collective bargaining agreement and ERISA, that Plaintiffs' damages throughout the audit period would be the amount determined by Plaintiffs' auditor . . . less the findings for John Bokena, or $3,126,133.66.

The Court has so found. On Count 1, the Court awards plaintiffs damages against John Kny Painting & Decorating, Inc. and Fine Finishes & Restoration, Inc., jointly and severally, in the amount of $3,126,133.66.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: May 23, 2016